RENNY v PORT HURON HOSPITAL

Docket No. 74884. Argued June 3, 1986 (Calendar No. 6). Decided
December 30, 1986. Rehearing denied 428 Mich 1206.

Karen Renny brought an action for wrongful discharge in the St.
Clair Circuit Court against Port Huron Hospital. The court,
James T. Corden, J., entered judgment on a jury verdict for the
plaintiff. The Court of Appeals, J. H. GILLIS, P.J., and T. M.
BURNS and N. J. KAUFMAN, JJ., affirmed in an unpublished
opinion per curiam (Docket No. 68824). The defendant appeals,
alleging error by the trial court in allowing the jury to deter-
mine as a matter of fact that the defendant's employee hand-
book established an employment contract which permitted
discharge only for just cause, and in allowing the jury to
consider whether the decision of a grievance board which
upheld the plaintiff's discharge was final and binding.

In an opinion by Justice CAVANAGH, joined by Chief Justice
WILLIAMS and Justices LEVIN and ARCHER, the Supreme Court
held:

1. The question of the existence of a contract of employment
which permitted discharge for just cause only is one of fact for
the jury where the employer establishes written policies and
procedures for the discharge of employees, but does not ex-
pressly retain the right to terminate employees at will. A
private employer cannot insulate itself from judicial review of
the discharge of an employee by unilaterally establishing a
method of dispute resolution to which employees are required
to submit.

2. Where an employee expressly consents to submit a griev-
ance to a joint employer-employee grievance board established
by the employer with the knowledge that the resulting decision
will be final and binding, the decision will be final unless a
court finds as a matter of law that the procedures employed by
the board did not comport with elementary fairness.

3. In this case, the trial court properly submitted the ques-

REFERENCES

Am Jur 2d, Labor and Labor Relations §§ 61, 920 et seq.
Am Jur 2d, Master and Servant §§ 43 et seq.
See the annotations in the Index to Annotations under Discharge
From Employment or Office.

tion of the existence of a just-cause contract to the jury, and sufficient evidence was presented at trial to permit the jury to conclude that such a contract existed. The defendant provided employees with a handbook establishing an optional grievance procedure and a list of disciplinary violations and penalties, including discharge. No express statement was included that its employees were terminable at will. The plaintiff relied on the policies in the handbook, and the defendant followed the grievance procedure.

4. Sufficient evidence also was presented to enable the jury to find that the plaintiff had not been discharged for just cause and that the discharge hearing was not final and binding because it did not comport with elementary fairness. Although the plaintiff agreed to submit her grievance to the grievance board and understood that the decision of the board was final and binding, she objected to the specific procedures in her formal grievance, procedures not described or enunciated in the handbook. The testimony of the employee services director did not rebut the plaintiff's claim of lack of due process. The plaintiff was not provided with adequate notice before the hearing regarding the identity of the witnesses and the specific allegations against her. Nor was she provided a fair opportunity to rebut the evidence against her, having been denied the rights to be present during the hearing, to present witnesses of her choosing, and to present evidence of her work record. Although the question whether the grievance procedure afforded the plaintiff elementary fairness was a question of law which should not have been submitted to the jury, it was not error requiring reversal. Nor was there error in the jury's determination of damages.

Affirmed.

Justice RILEY, joined by Justices BRICKLEY and BOYLE, dissenting, stated that the circuit court erred in not enforcing the decision of the employee grievance board which the plaintiff contractually agreed to accept as the final and binding resolution of her grievance. Her voluntary participation in the arbitration hearing and failure to object to the procedural fairness of the hearing precluded her from later challenging the enforcement of the resulting adverse decision on broad procedural fairness grounds.

1. MASTER AND SERVANT — DISCHARGE — JUST CAUSE.

The question of the existence of a contract of employment which permitted discharge for just cause only is one of fact for the jury where the employer establishes written policies and procedures for the discharge of employees, but does not expressly

retain the right to terminate employees at will; a private employer cannot insulate itself from judicial review of the discharge of an employee by unilaterally establishing a method of dispute resolution to which employees are required to submit.

2. MASTER AND SERVANT — GRIEVANCE PROCEDURES — FINALITY OF DECISIONS.— DUE PROCESS.

Where an employee expressly consents to submit a grievance to a joint employer-employee grievance board established by the employer with the knowledge that the resulting decision will be final and binding, the decision will be final unless a court finds as a matter of law that the procedures employed by the board did not comport with elementary fairness.

*Huegli, Parrish & Mitchell* (by *Richard F. Huegli, Jr.*) for the plaintiff.

*Cross, Wrock, Miller & Vieson* (by *Dan W. Chandler*) for the defendant.

CAVANAGH, J. Plaintiff brought suit against defendant hospital for wrongful discharge. The jury found for plaintiff and awarded her $100,000 in damages. In this appeal, Port Huron Hospital contends that the trial court committed error requiring reversal in allowing the jury to determine as a matter of fact whether the Employee Handbook established an employment contract allowing discharge only for "just cause." The hospital further contends that the trial court erred in allowing the jury to consider whether the decision of the grievance board upholding plaintiff's discharge was final and binding.

We find that the trial court properly submitted the question of a just-cause contract to the jury. The existence of a just-cause contract is a question of fact for the jury where the employer establishes written policies and procedures by which to discharge an employee, but does not expressly retain the right to terminate employees at will. Further-

more, a private employer cannot insulate itself from judicial review of an employee's discharge by unilaterally establishing a method of dispute resolution to which the employee must submit.

However, where an employee has expressly consented to submit a complaint to a joint employer-employee grievance board established by the employer with the knowledge that the resulting decision is final and binding, the decision shall be final unless the court finds as a matter of law that the procedures used did not comport with elementary fairness. If the court so finds, the merits of the case may be submitted to the jury to determine if, in fact, the employee was fired for just cause.

We find that there was sufficient evidence for the jury to find a just-cause contract. Although the question whether the grievance procedure afforded plaintiff elementary fairness was a question of law which should not have been submitted to the jury, we find no error which requires reversal. We find, as did the jury, that plaintiff's discharge hearing was not final and binding as it did not comport with elementary fairness. Furthermore, there was sufficient evidence for the jury to find that plaintiff had not been discharged for just cause.

### I. FACTS

Plaintiff was employed as a registered nurse by defendant hospital. On June 18, 1980, plaintiff was working as a circulating nurse in Operating Room 2 at the hospital. Another registered nurse, Mary Brown, was in charge of Operating Room 2 for the week. Between operations, the nurses, aides, and orderlies were responsible for cleaning the room to assure aseptic conditions.

At the end of the second operation, plaintiff suggested that scrub nurse, Marion Zechiel, should

take her coffee break. Plaintiff took the patient to the recovery room. When she returned, she saw that Mrs. Zechiel was still in the room. Plaintiff testified that she told Mrs. Zechiel to take her coffee break at the designated time or she would not get one. Plaintiff believed that the cleaning had been completed.

Mrs. Zechiel testified that plaintiff ordered her to stop cleaning the operating room as it was not helping "our cause." According to Mrs. Zechiel's complaint and trial testimony, several of the registered nurses were unhappy about having to do work formerly assigned to aides. Mrs. Zechiel resented plaintiff's comment but said nothing. She completed what she was doing and left the room.

When the third patient was brought into the operating room, two scrub nurses and plaintiff were unable to determine if the light handles above the operating table had been changed. The nurses assumed that the handles were contaminated. At the conclusion of the third operation, plaintiff and Mary Brown asked Mrs. Zechiel if she had changed the light handles. Mrs. Zechiel could not remember whether she had changed the handles or not. The following day, Brown filed an incident report with operating room manager, Paul Tyjewski, as required by hospital policy.

Brown testified at trial that Tyjewski asked her if she had attempted to sabotage the operating room procedure. Brown denied having done so and was shocked at the question. Both Brown and Tyjewski testified that Brown assumed full responsibility as head nurse for the incident. Brown also testified that neither she nor plaintiff attempted to blame Mrs. Zechiel for the incident.

Brown was not questioned further by Tyjewski or any representative of the hospital until after plaintiff was discharged. She was not called as a

witness at plaintiff's discharge hearing although she had been present in the operating room when plaintiff spoke to Mrs. Zechiel. Brown testified at trial that she overheard plaintiff's comment to Zechiel about her coffee break but could not remember the exact words as the statement was "so unremarkable." She also testified that Tyjewski called a meeting in the nurses' lounge on June 24 to assure the staff that the rumors of plaintiff's firing over the incident in the operating room were unfounded.

Marion Zechiel testified that Tyjewski called her on June 19, the day after the incident. She agreed to meet him at his office the following day to submit a statement about the incident. Her statement alleged several incidents where nurses had undermined hospital policy. She specified two separate incidents with two separate nurses, including the incident with plaintiff. She also claimed that a small group of people were working against the new teamwork system instituted by Tyjewski.[1]

---

[1] June 20, 1980

Several times when I have been helping in a room (getting ready for the next case) I have been told my help was not needed.

I remember specifically one day when I was helping 2 R.N.'s "open up" for one of Dr. Townley's "Total" cases and Bev Bowns [sic] said, "We already have *two circulating nurses*, what are you doing in here, Marion?"

Then this week, on Wed. I was a "second scrub nurse" in O.R. #2. When I was helping clean the room (I cleaned the lights & took off the light handles, washed off the tables, etc.), Karen Renny said, "Marion, you know you really aren't helping us any by cleaning between cases! There are 3 RN's in here cleaning & the aides should be doing it, not us."

When the next case ended, I cleaned the suction bottle & was told to go to lunch. I did not take off the light handles & I did not clean between this case, because I left the room to go to lunch. Mary Brown & Marsha Dupuis were in the room & getting ready for the next case when I left.

Marion L. Zechiel, R.N.

In conclusion, I will add that I have felt as though there are

On Friday, June 20, Tyjewski called plaintiff to his office. Tyjewski told plaintiff that she had intimidated another employee. Plaintiff denied this allegation and expressed concern that Tyjewski was singling her out due to recent conflicts between Tyjewski and herself. Tyjewski suspended plaintiff with pay. He told her to return to his office on Monday. When plaintiff returned Monday, Tyjewski discharged her without further discussion. He handed her a discipline form noting that she was being discharged for "deliberate restriction of work."

In accordance with step two of the grievance procedure established by the hospital in its Employee Handbook, plaintiff went to speak with the Assistant Director of Employee Services, Mr. Yuille.[2] Yuille testified at trial that his role was that of a mediator. Prior to his meeting with

[sic] a small group of people who have been working against our new system of team-work in the O.R. They seem to hope it *doesn't* work.

[2] STEP ONE:

Discuss your grievance with your immediate supervisor within* three days after the incident. If you are not satisfied with the results of this, take your grievance to the next supervisory level—if one exists in your department.

(NOTE: Begin with Step Two, if your grievance concerns disciplinary action.)

STEP TWO:

If your grievance is not settled in Step One, submit your grievance in writing to Employee Services (within three days after the incident, if your grievance involves disciplinary action).

Your grievance should be written on a grievance report form, available from Employee Services.

An Employee Services representative will try to resolve your grievance through counsel and advice within* two days. If the grievance is not mutually resolved, proceed to Step Three.

STEP THREE:

Within* 5 working days of your request, the Director of Employee Services will schedule a meeting of the Employee Grievance Board.

plaintiff, Yuille had met with Tyjewski. Yuille had·
advised him of the appropriate violation in the·
handbook with which to charge plaintiff. After
speaking with plaintiff, Yuille spoke with Tyjewski
again, but was unable to resolve the problem.

Yuille did not speak with Zechiel or Brown or
conduct any investigation of the incident. He testi-
fied that he felt plaintiff understood the charge
against her, which plaintiff told him was intimi-
dating another employee. When Yuille contacted
plaintiff to inform her that Tyjewski refused to
rescind the firing, plaintiff indicated an interest in
pursuing her grievance before the grievance
board.[3]

> You will be able to select this panel of six employees (3
> supervisory and three non-supervisory) from a group of ten
> employees (five supervisory and five non-supervisory) who have
> been selected by the Director of Employee Services from a list
> of qualified volunteers.
> The Board will thoroughly hear and investigate the facts of
> your case and then vote by secret ballot. If there is a tie, the
> Director of Employee Services will also vote.
> These results will be posted within* three days after the
> Board hearing.
> The decision of the Board is final and binding, unless it was
> necessary for the Director of Employee Services to break a tie
> vote and you are not satisfied with the results. In that case, you
> can proceed to Step Four.
> STEP FOUR:
> In order to appeal your grievance to Step Four you must
> submit a second written appeal to Employee Services within*
> three days after the Board's decision has been posted. Note:
> This final appeal is available to you, if the Director of Em-
> ployee Services voted to break the Board's tie vote.
> A meeting with the Executive Director and Associate Execu-
> tive Director (pending their availability) will be scheduled for
> you within* five days after you have submitted the appeal).
> After you have had your meeting with Administration, their
> decision will be given to you (in writing) within* two days: This
> decision is, in all cases, final and binding.

> *Excludes Saturdays, Sundays, and National Holidays.

[Employee Handbook, excerpt, pp 18-20.]

   [3] An *Employee Grievance Board procedure is available to*

In accordance with step three of the grievance procedure, plaintiff met with Mr. Scheib, the Vice President of Employee Services, who informed her about the procedures of the grievance board. Mr. Scheib also served as the chairman of the grievance board. Plaintiff testified that Scheib explained the process by which she could choose the six members of the joint employee-employer board. He also explained he would vote in case of a tie vote and that the decision of the board was final and binding. Plaintiff claims that Scheib told her that she could not have counsel present, could not see the complaint against her, and would not be informed of the identity of the other witnesses testifying at the hearing. She could not be present during the testimony of any other witness or during Mr. Scheib's opening remarks.

Mr. Scheib testified at trial that plaintiff's discipline slip was the only notice she received. He stated that employees were not allowed to hear the opening remarks or the testimony of other

*you as a fair and effective means to resolve work related complaints and problems.* By using the procedure's series of four progressive steps, you can call upon your supervisors, Employee Services, the Employee Grievance Board, and Administration to evaluate your case and decide whether or not you have been treated fairly. You can use the procedure when you feel a work related decision is not consistent with established hospital policies and practices, including those outlined in this Handbook.

Grievances may include such things as discipline, transfer, job posting selection, unfair assignment of vacation or holiday time, a personal request that was denied, etc. You cannot use the procedure to appeal decisions related to the hospital's responsibility to determine the number and assignment of employees, to establish rules of conduct, to determine the hours and days of work, starting and quitting times, wages and benefits, etc.

The procedure involves a series of four steps. In most cases, begin with Step One. In cases concerning disciplinary action, begin with Step Two. [Employee Handbook, p 18.]

witnesses. Plaintiff would have the complaint read
to her at the hearing and could testify on her own
behalf. The aggrieved employee was the first wit-
ness and would be called back only if the board
had further questions after hearing testimony of
other witnesses.

Scheib could not recall if plaintiff objected to
any of the procedures prior to or during the hear-
ing or if she requested counsel be present. He
could not recall his opening remarks to the com-
mittee or whether plaintiff was given a copy of the
complaint at any time. No records or transcripts of
a discharge hearing are kept, and the committee
makes no finding.

While Scheib testified that plaintiff could ask
the board to call witnesses, he could not recall if
he had informed plaintiff of this right. However,
no witnesses may be called without the board's
consent, and a witness's appearance before the
board is voluntary. An employee has no right to
cross-examine or rebut a witness's testimony or to
make any closing or summary statements.

Plaintiff submitted a formal grievance on June
25, 1980.[4] On July 1, 1980, plaintiff's grievance was
considered by the panel which she had selected.
The board heard three witnesses: plaintiff, Tyjew-
ski, and complainant Zechiel. After the hearing,
the board voted five to one to uphold plaintiff's
firing.

---

[4] I was discharged at 1000 on 6-23-80, for "deliberate restric-
tion of work on 6-18-80 in O.R. #2." These charges are un-
founded and untrue. I was not given the privilege of reading
the signed statement against me; seeing the party accusing me
of this act, etc. The other R.N. in the room, (who was witness to
this accused action), was not questioned.

I expect my job to be returned to me, (with back pay), also
this occurence to be removed from my record. Also, I expect
full and fair treatment in the future from Mr. Tyjewski.

Plaintiff filed suit in circuit court for wrongful discharge on the basis that defendant's Employee Handbook established a just-cause contract, that defendant had breached this contract by firing plaintiff without just cause, and that the grievance procedure was not final or binding as it denied plaintiff due process. The jury found for plaintiff. Defendant hospital appealed the circuit court's decision. The Court of Appeals found that plaintiff submitted sufficient evidence of a just-cause contract to allow the question to go to the jury. *Toussaint v Blue Cross,* 408 Mich 579; 292 NW2d 880 (1980). The Court of Appeals found further that, as plaintiff had alleged that the grievance process was unfair, there existed a question of fact which entitled plaintiff to seek judicial review on the merits of her claim. *Breish v Ring Screw Works,* 397 Mich 586; 248 NW2d 526 (1976); *Fulghum v United Parcel Service, Inc,* 130 Mich App 375; 343 NW2d 559 (1983). The Court of Appeals concurred with the verdict and the amount of the award.[5] This Court has since issued an opinion in *Fulghum,* 424 Mich 89; 378 NW2d 472 (1985).

Defendant hospital appealed the decision of the Court of Appeals, and we granted leave.[6]

## II. JUST-CAUSE CONTRACT

Plaintiff testified that she was hired in December 1975. At that time, she was required to undergo a one-week orientation program that included a page-by-page review of the Employee Handbook. All employees, including plaintiff, signed the acknowledgment and agreement clause at the end of the book. The handbook was revised

[5] Unpublished opinion per curiam of the Court of Appeals, decided June 21, 1984 (Docket No. 68824).
[6] 422 Mich 975 (1985).

in 1978, and plaintiff signed the revised handbook as follows:

> ACKNOWLEDGEMENT AND AGREEMENT
>
> I acknowledge that I have received a copy of the Employee Handbook, which outlines my privileges and responsibilities as an employee of Port Huron Hospital.
>
> I have read and fully understand the contents of this handbook, and I agree to abide by the rules and regulations it outlines. [Handwritten:] *I don't agree, but will abide.*

Plaintiff testified that it was her understanding that the hospital would not let an employee go without following the guidelines established in the handbook. She stated that she expected to follow the policies in the handbook and expected the hospital to do the same.

The Employee Handbook provided for a grievance board as a "fair and effective means to resolve work related complaints and problems." This was not a mandatory procedure to which employees had to submit. The handbook also included defendant hospital's philosophy about unions.

> We firmly believe that there is no need for unions at Port Huron Hospital. Proof of our conviction lies in our continuous history of prosperous operations without collective bargaining agreements with unions. *We strive for excellence in our work relationships by dealing fairly and directly with people, without the interference of a third party.* We furthermore believe that you, as an employee, must be free to speak for yourself and to openly discuss comments, suggestions, and problems with your supervisor, administration, and other hospital staff. We will, therefore, strongly oppose all union organizing attempts at Port Huron Hospital through proper and legal channels.

There was no evidence at trial to show any employee involvement, directly or indirectly, in creating the grievance procedure although employees did volunteer to sit on the grievance board. It may be inferred that the grievance procedure was unilaterally established by defendant hospital and did not involve any "third parties," including a neutral third-party decisionmaker such as an arbitrator.

The handbook also contained the following statements of policy:

MANAGEMENT RIGHTS
*The Hospital retains the sole right to manage and operate the Hospital.* This includes, but is not limited to, the sole and exclusive right to decide the number and assignment of employees; to hire, lay off, discipline, discharge, assign, transfer, and promote employees; and to determine starting and quitting times and working days and hours for all employees. *These rights are subject only to the regulations and restrictions outlined in this Employee Handbook.* The Hospital has the sole and exclusive right to administer all matters not specifically and expressly covered in this Handbook, without limitations, implied or otherwise.

\* \* \*

CONCLUSION
The policies in this Employee Handbook are comprehensive, but by no means cover all the circumstances and situations you might encounter while an employee of Port Huron Hospital. When you have questions that are not answered in this handbook, please feel free to discuss them with Employee Services. [Employee Handbook, pp 28 and 43.]

Defendant hospital claims that the handbook is not a contract and that, if it were, plaintiff did not sign the contract in a manner that indicated her

intent to be bound by the contract. Moreover, even if the handbook does establish a contract between plaintiff and defendant hospital, the hospital reserved the right to terminate employees at will under its management rights clause.

In *Lynas v Maxwell Farms,* 279 Mich 684, 687; 273 NW 315 (1937), this Court held that contracts for permanent employment or for life may generally be construed to be terminable at the will of either party in the absence of distinguishing features, provisions, or consideration in addition to the services to be rendered. This Court clarified what constituted distinguishing features, provisions, or additional considerations in *Toussaint v Blue Cross, supra,* 598-599.

A provision in the employment contract providing that an employee shall not be discharged except for cause is legally enforceable whether by express agreement, oral or written, or as a result of an employee's legitimate expectations grounded in an employer's policy statements. These legitimate expectations may be grounded in an employer's written policy statements as set forth in the manual of personnel policies. *Id.*

The employer is still free to enter into employment contracts terminable at will and without assigning cause. An employer may require prospective employees to acknowledge that they serve at the will or pleasure of the company. Moreover an employer is under no obligation to establish personnel policies or practices. However, it is presumed that the employer, as well as the employee, benefits from establishing a clearly defined employment relationship. *Toussaint, supra,* 610-612.[7]

---

[7] The existence of a just-cause contract based on the employer's statements of policy and procedure does not require evidence of mutuality of obligation. Thus, the contract may be enforceable even though neither party has signed the policy statement, the employer

Where an employer has informed employees that personnel policies are subject to unilateral changes by the employer, the employee has no legitimate expectation that any particular policy will remain in force. However, it is reasonable for employees to expect that policies in force at any given time will be applied uniformly to all.

> If there is in effect a policy to dismiss for cause only, the employer may not depart from that policy at whim simply because he was under no obligation to institute the policy in the first place. Having announced the policy, presumably with a view to obtaining the benefit of improved employee attitudes and behavior and improved quality of the work force, the employer may not treat its promise as illusory. [*Toussaint, supra,* 619.]

Where an employer has agreed to discharge an employee for just cause only, its decision to terminate the employee is subject to judicial review. The jury decides as a matter of fact whether the employee was discharged for cause. While the jury may not substitute its opinion for that of the employer's, it may determine whether the employee committed the specific misconduct for which he was fired, whether the firing was pretextual, whether the reason for discharge amounted to good cause, or whether the employer was selectively applying the rules. It is not enough that an employer acted in good faith or was not unreasonable. *Id.,* pp 621-624.

By establishing an internal grievance procedure an employer may avoid judicial review.

Additionally, the employer can avoid the perils

may unilaterally amend his policy without notice to the employee, and there is no reference to the specific employee or job in the statements. Moreover, it is not necessary that an employee know of the employer's policies prior to being hired. *Toussaint, supra,* 614-615.

of jury assessment by providing for an alternative method of dispute resolution. A written agreement for a definite or indefinite term to discharge only for cause could, for example, provide for binding arbitration on the issues of cause and damages. [*Toussaint, supra,* p 624.]

Defendant's Employee Handbook was provided to new employees, explained during orientation, signed by all employees, and periodically revised by the employer. Employees were expected to read the handbook carefully and become familiar with its contents.[8] While the hospital maintained the sole right to discharge employees, this right was expressly subject to the regulations and restrictions provided for in the handbook.

The handbook provided a list of disciplinary violations and the penalties for each.[9] It also pro-

___

[8] Welcome

Welcome to Port Huron Hospital. We are happy that you have joined our staff and sincerely hope that your association with us will be long and mutually beneficial. We will do our very best to make it so.

Whether or not your duties bring you to the bedside of patients, your job is equally important to our goal of "providing the sick with the best in comfort and care with kindness and compassion—always improving." You will share in the satisfaction of helping to perform an important human service.

This handbook will introduce you to the hospital, its working conditions, and policies that affect employees. You will learn what to expect from us and what we expect from you.

*Read this handbook carefully and become familiar with its contents.* Should you have questions about any of the material, discuss them with your supervisor or Employee Services.

*Policies will, of course, be continually revised and altered, as needed, to provide for the best interest of all employees.*

We are glad you are here. May you have success in your new position.

C. W. McKinley
Executive Director

[9] CODE OF PERSONNEL CONDUCT

Just as society must have laws that allow people to productively and safely live together, every organization must have

vided for an optional grievance procedure. There is no express statement within the handbook that employees were still terminable at the will of the hospital. While the management rights clause implies that the employer could revise its policies unilaterally, there was no evidence presented at trial that defendant hospital had altered any of

codes and rules to ensure its effective operation. Such codes are not intended to restrict the rights of any individual, but rather to define and protect the rights of all, including our patients. When rules are broken, the infraction must be pointed out and corrected. This process is called "constructive discipline." The purpose of the program is to aid you in improving your performance.

Listed below are violations of our Code of Personnel Conduct. When you commit these acts, you subject yourself to disciplinary action ranging from verbal reprimand, written reprimand, suspension without pay, and immediate discharge, depending upon the specific offense and your past record.

GROUP I

Violations of the following rules will be cause for disciplinary actions as prescribed below.

First Offense—Verbal reprimand up to and including written reprimand.

Second Offense—Written reprimand up to and including suspension without pay.

Third Offense—Disciplinary suspension up to and including discharge.

Fourth Offense—Discharge. [Violations enumerated.]

\* \* \*

GROUP II

Violations of the following work rules can be as serious as violations of rules in Group III depending upon the circumstances. Accordingly, violations of these rules will be cause for disciplinary action as prescribed below and will be dependent upon the seriousness of the offense.

First Offense—Written reprimand up to and including discharge. [Violations enumerated.]

\* \* \*

GROUP III

Violations of the following work rules will be considered cause for discharge for the first offense, except under the most extenuating circumstances. [Violations enumerated.] [Employee Handbook, pp 7-10.]

the policies upon which plaintiff relied. Indeed, any suggestion that the hospital could fire an employee at will despite the express statements in its handbook and without evidence of a policy change would imply that the handbook was a sham.

Plaintiff testified that she relied on policy statements in the handbook. In signing the handbook, she acknowledged that she had read and understood its contents and would abide by its rules. Apparently, she didn't agree with all of the policies in the book, however she was not required to do so. Defendant hospital did not object to the manner in which she signed her handbook until plaintiff filed suit for wrongful discharge almost two years later. The fact that defendant hospital followed the grievance procedure with plaintiff is evidence that a just-cause contract existed upon which plaintiff had legitimately relied.

### III. THE FINALITY RULE

*Toussaint* held that an employer could avoid jury review of an employee's termination by establishing an alternative method of dispute resolution such as binding arbitration on the issue of cause and damages. We concur. However, it is important to note that *Toussaint* suggested using an impartial, third-party decisionmaker, namely an arbitrator, and that arbitration differs significantly from the procedure established by defendant hospital. Moreover, even the decisions resulting from arbitration, administrative hearings, and joint employer-employee committees established as a result of collective bargaining, are not immune from limited judicial review.

Defendant hospital argues that plaintiff volunta-

rily submitted her grievance to the grievance board and should not now be able to claim that the decision of the board is not final or binding on the basis of "fairness." Defendant characterizes plaintiff's acts as a reformation of the just-cause contract to allow for judicial review when an employee is not satisfied with the result of grievance proceedings.

We disagree. Plaintiff does not claim that a joint employer-employee board could never return a fair decision. She argues that the procedures established by defendant hospital provided no opportunity for the board to do so in this case as plaintiff was unable to properly defend herself. Under these circumstances, it is not necessary that plaintiff allege bias on the part of the board or its individual members.

### A. ARBITRATION

Where parties have an agreement to arbitrate that conforms with the arbitration statute, the court may compel a party to submit a claim to arbitration. MCR 3.602(B)(2).[10] The arbitrator sets the time and place of the hearing and may adjourn it for good cause.[11] The arbitrator swears to hear and fairly consider all matters submitted to make a just award according to his or her best understanding. The arbitrator administers oaths to witnesses.[12] A witness may be subpoenaed to attend a hearing or may submit a deposition for use as evidence in accordance with the court rules.[13] Each party has a right to be represented by an

[10] MCL 600.5001-600.5035; MSA 27A.5001-27A.5035 and MCL 600.5040-600.5065; MSA 27A.5040-27A.5065.

[11] MCR 3.602(D).

[12] MCR 3.602(E).

[13] MCR 3.602(F); MCR 2.506.

attorney.[14] Finally, an arbitration award may be vacated for the following reasons:

> (a) the award was procured by corruption, fraud, or other undue means; .
>
> (b) there was evident partiality by an arbitrator appointed as a neutral, corruption of an arbitrator, or misconduct prejudicing a party's rights;
>
> (c) the arbitrator exceeded his or her powers; or
>
> (d) the arbitrator refused to postpone the hearing on a showing of sufficient cause, refused to hear evidence material to the controversy, or otherwise conducted the hearing to prejudice substantially a party's rights.[15]

It is obvious that the discharge hearing in the present case did not afford plaintiff the procedural protections that are provided by statutory arbitration. However, this Court recently agreed with the United States Supreme Court that a decision of a joint employer-employee grievance committee should be granted the same deference as that afforded an independent arbiter. *Fulghum v United Parcel Service*, 424 Mich 89; 378 NW2d 472 (1985).

In *Fulghum,* plaintiffs submitted their grievances to a joint employer-employee committee established by the collective bargaining agreement. When the committee upheld plaintiffs' firing, plaintiffs brought suit for wrongful discharge, defamation, invasion of privacy, and infliction of emotional distress. The lower court found as a matter of law that the grievance process comported with "elementary fairness" and that plaintiffs were bound by the factual determinations made by the grievance tribunal. Plaintiffs appealed to the Court

---

14 MCR 3.602(G).

15 MCR 3.602(J). *DAIIE v Gavin,* 416 Mich 407, 417-418; 331 NW2d 418 (1982), citing former court rule GCR 1963, 769.9(1).

of Appeals which held that federal law established
a strong policy in favor of deference to this method
of dispute resolution.

> Where a collective-bargaining agreement pro-
> vides a method by which disputes are to be re-
> solved, there is a strong policy in favor of defer-
> ence to that method of resolution. *Hines v Anchor
> Motor Freight, Inc,* 424 US 554; 96 S Ct 1048; 47 L
> Ed 2d 231 (1976). This policy can only be effectu-
> ated "if the means chosen by the parties for settle-
> ment of their differences under a collective bar-
> gaining agreement is given full play." *United
> Steelworkers of America v American Mfg Co,* 363
> US 564, 566; 80 S Ct 1343; 4 L Ed 2d 1403 (1960).
> Indeed, the United States Supreme Court has held
> that the decisions of joint management-labor griev-
> ance committees, such as was employed in this
> case, are entitled to the same deference as the
> decisions of independent arbitrators. *General Driv-
> ers, Warehousemen & Helpers, Local Union No 89
> v Riss & Co, Inc,* 372 US 517; 83 S Ct 789; 9 L Ed
> 2d 918 (1963).
>
> Although the Supreme Court recognized an ex-
> ception to the rule of finality in the context of a
> Title VII employment discrimination claim in *Al-
> exander v Gardner-Denver Co,* 415 US 36; 94 S Ct
> 1011; 39 L Ed 2d 147 (1974), it has no application
> to this case. Here, the finding of the grievance
> committees that plaintiffs seek to avoid is not one
> of constitutional magnitude or statutory construc-
> tion; rather, it is a simple question of fact clearly
> within the competence of the grievance commit-
> tees. See, also, *Ivery v United States,* 686 F2d 410
> (CA 6, 1982), especially Jones, J., *concurring.* [130
> Mich App 377-378.]

This Court agreed with this reasoning. Plaintiffs
were precluded from pursuing their actions for
defamation, invasion of privacy, and intentional
infliction of emotional distress.

*Fulghum* can be distinguished from the present

case. The plaintiffs in *Fulghum* were represented by the union at the discharge hearing and appeal. The joint employer-employee committee was established by a negotiated contract and was not, therefore, employer controlled. Importantly also, there was no finding that the grievance procedures lacked elementary fairness. Finally, it is clear from *Fulghum* that even the decisions of these committees may be subject to limited judicial review.

## B. *ELEMENTARY FAIRNESS*

An adjudicative determination by either an administrative tribunal or by arbitration may be challenged on procedural grounds.[16] Where a plaintiff alleges that the grievance process lacked elementary fairness, the court may review the proceedings.

The Federal labor law on this question mandates

---

[16] Allowing claim and issue preclusion within the judicial system rests on the assumption that the rendering court and the recognition court have the same jurisdiction, similar or identical rules of procedure, and "equal judicial dignity." The nature of the initial tribunal affects the scope of preclusion. Relitigation may be permitted when there are significant limitations on the quality or extensiveness of the procedures followed by the two courts.

> The essential issue is a comparison of the quality and intensiveness of the opportunity to litigate, and the incentive to litigate, in the original litigation as compared to the opportunity and incentive in the second litigation. If the prior opportunity and incentive to litigate the claim or issue in question were substantially the same as would have existed had the matter been adjudicated in the second forum, the procedural prerequisites exist for normal application of the rules of res judicata. The comparison of procedures should focus on the practical aspects of the procedures involved and not simply on matters of form. For example, proof-taking in an administrative or arbitration tribunal may be relatively informal but may nevertheless permit the parties to present substantially the same evidence that might be adduced through the more formal procedures characteristic of courts. [Restatement Judgments, 2d, § 83, p 265.]

that judicial review of a "final" decision on the merits of an aggrieved employee's complaint is barred unless the final step of the grievance procedure is inadequate to provide a procedurally fair decision. [*Breish v Ring Screw Works, supra,* 588.]

The essential elements necessary to fair adjudication in administrative and arbitration proceedings are:

1) Adequate notice to persons who are to be bound by the adjudication;

2) The right to present evidence and arguments and the fair opportunity to rebut evidence and argument by the opposing argument;

3) A formulation of issues of law and fact in terms of the application of rules with respect to specified parties concerning a specific transaction, situation, or status;

4) A rule specifying the point in the proceeding when a final decision is rendered; and,

5) Other procedural elements as may be necessary to ensure a means to determine the matter in question. These will be determined by the complexity of the matter in question, the urgency with which the matter must be resolved and the opportunity of the parties to obtain evidence and formulate legal contentions.[17]

We do not believe that a grievance procedure, lacking in these elements, unilaterally established by the employer and subject to revision at any time by the employer, ensures an employee fairness. Plaintiff did consent to submit her claim to the grievance board after her conversations with the Assistant Director and Director of Employee Services. She understood that the decision of the joint employee-employer board was final and binding. However, plaintiff objected to the specific procedures being used both in her formal grievance and in her complaint before this Court. These are

[17] Restatements Judgments, 2d, §§ 83(2) and 84(3)(b).

procedures that were not described or enunciated in the handbook. Moreover the testimony of the Employee Services Director did not rebut plaintiff's assertions as to the unfairness of the procedures.

It is clear that plaintiff was not provided with adequate notice before the hearing of who the witnesses were against her and what the complaint specifically alleged. While plaintiff undoubtedly assumed that Zechiel and Tyjewski would testify, she did not know who else was to be called. Nor was plaintiff given the right to present evidence such as the testimony of Mary Brown or her own work records. Refusing plaintiff the right to be present during the hearing denied her a fair opportunity to rebut the evidence against her.

This lack of elementary fairness in the procedures utilized entitled plaintiff to submit the merits of her claim to the jury to determine if, in fact, she was fired for just cause. The jury was entitled to determine whether plaintiff had, in fact, committed the specific misconduct for which she was fired, whether the firing was pretextual, or whether the employer was selectively applying the rules. As the handbook established that "deliberate restriction of work" was an offense for which plaintiff could be fired, this was not subject to jury review.

We conclude that there was sufficient evidence submitted at trial for the jury to conclude that plaintiff had not been fired for "deliberate work restriction," that the firing was pretextual, or that the employer was selectively applying the rules.

### IV. DAMAGES

Defendant hospital alleges that plaintiff suffered little or no past damages and was not entitled to

future damages. Defendant bases its arguments on earlier decisions of this Court holding that future damages may not be awarded under employment contracts terminable at will. *Sax v Detroit G H & M R Co,* 129 Mich 502; 89 NW 368 (1902); *Mallory v Jack,* 281 Mich 156; 274 NW 746 (1937).

By establishing a just-cause contract, plaintiff has established a protected interest in her employment at the hospital. Her subsequent professional employment did not equal her earnings at defendant hospital. Defendant testified to expenses due to loss of health insurance and the necessity of commuting. In addition, she was no longer eligible for the overtime pay that she had previously received for working additional hours at defendant hospital.

The jury was properly instructed on plaintiff's duty of mitigation. There was sufficient evidence for the jury to conclude that plaintiff had in fact suffered damages and that the amount of damages was $100,000.[18] We find no error.

Affirmed.

WILLIAMS, C.J., and LEVIN and ARCHER, JJ., concurred with CAVANAGH, J.

RILEY, J. (*dissenting*). I respectfully dissent. I would hold that the circuit court erred in not enforcing the decision of the employee grievance board which plaintiff contractually agreed to accept as the final and binding resolution of her grievance with the defendant. I am persuaded that the majority's reliance upon *Fulghum v United Parcel Service,* 424 Mich 89; 378 NW2d 472 (1985), and *Breish v Ring Screw Works,* 397 Mich 586; 248

---

[18] This would have amounted to approximately $4000 in damages over twenty-five years until plaintiff reached retirement age of sixty-two years.

NW2d 526 (1976), for its holding that the arbitral decision in this case was contractually unenforceable because the arbitration hearing lacked procedural "fairness," is misplaced. Furthermore, I would hold that plaintiff's volitional participation in the arbitration hearing, and failure to object to the procedural "fairness" of that hearing, precluded her from challenging the enforcement of the resulting adverse decision on broad procedural "fairness" grounds.

I

The defendant hospital discharged plaintiff, a registered nurse, for "deliberate restriction of work" productivity on June 23, 1980. Plaintiff chose to avail herself of the contractual grievance procedure offered by the defendant, filing a written grievance challenging the propriety of her termination on June 25, 1980. After being fully informed about the procedure, plaintiff agreed to submit to the "final and binding" arbitration of her grievance by an employee grievance board, the members of which would be selected by plaintiff from a list of employee volunteers. Plaintiff's grievance was heard by the employee grievance board on July 1, 1980. Plaintiff did not object to the grievance procedure or the conduct of the hearing prior to the board's rendering of its decision upholding her discharge for "deliberate restriction of work" productivity. After the board rendered its adverse decision, plaintiff commenced this action for wrongful discharge.

The trial court denied defendant's motion for summary judgment on the basis of its assertion that the decision of the employee arbitration panel was, by mutual agreement, "final and binding," and entitled to judicial enforcement. The trial

court ruled that whether the arbitral decision was "final and binding" was to be submitted to the jury along with the merits of plaintiff's breach of contract action. The jury returned a verdict in plaintiff's favor and awarded her $100,000 in damages. The Court of Appeals rejected each of the defendant's allegations of error, on appeal by right, affirmed each of the challenged rulings of the trial court, and upheld the jury verdict in plaintiff's favor.

II

Defendant argues first, as it did in the Court of Appeals, that the trial court erred in denying its motion for summary judgment on the basis of the contractually enforceable decision of the employee grievance board and, instead, in ruling that the enforcement of that decision as the "final and binding" resolution of plaintiff's breach of contract claim was a factual determination to be submitted to the jury.[1] The Court of Appeals held that the contractual enforcement of the grievance board decision was properly submitted to the jury. The Court reasoned that the jury was required to determine whether the grievance board procedure, to which plaintiff and the defendant had consented in the submission of their dispute, was "fair" as a factual matter in order to determine whether the decision was "final and binding." The Court of Appeals relied on *Breish v Ring Screw Works,* *supra,* and *Fulghum v United Parcel Service,* 130 Mich App 375; 343 NW2d 559 (1983), to support its analysis. I am persuaded that the Court of Appeals

---

[1] The majority, following the format reflected in the brief of plaintiff-appellee, addresses the issues presented in reverse chronological order. Because my resolution of the first issue—whether the arbitration decision was contractually enforceable—would be dispositive of this appeal, I do not address the remaining issues.

reliance on *Breish* and *Fulghum* was misplaced and that its decision for affirmance was erroneous.

In *Breish,* we noted in the context of federal labor law that " '[f]inal adjustment by a method agreed upon by the parties is declared to be the desirable method for settlement of grievance disputes . . .' " and that this policy " 'can be effectuated only if the means chosen by the parties for settlement of their differences under a collective bargaining agreement is given full play.' " *Id.,* 597 (quoting *United Steelworkers of America v American Mfg Co,* 363 US 564, 566; 80 S Ct 1343; 4 L Ed 2d 1403 [1960]). We held, however, that an exception to the "finality rule" exists in cases in which a union breaches its duty of fair representation or when the final step of the contractual grievance procedure is inadequate to provide the individual employee a procedurally fair decision on the merits of his claim. The "final" step of the grievance procedure in *Breish* was the decision of the individual employee's fellow union members to strike over his grievance. We held that a "strike vote" decision as the final adjudication of the substance of the plaintiff's claim was unsatisfactory "for the essential reason that such a procedure placed those 'adjudging' the substance of plaintiff's claim in a legally unacceptable conflict of interest position." *Id.,* 603. Because the final decision of whether plaintiff was wrongfully discharged was adjudged by persons "in a conflict of interest position," we held that such a procedure was "inadequate to provide . . . any kind of fair merits decision." *Id.,* 604.

Unlike *Breish,* the present case does not involve a union's duty of fair representation, or anything even remotely analogous to a "strike vote" decision as the final adjudication of the substance of plaintiff's grievance.

In *Fulghum v United Parcel Service, supra,* 424 Mich 92-93, we held that the decision of an employee grievance board is to be given the same judicial deference as that afforded an independent arbiter, expressing our general acceptance of the federal policy in that regard:

> "Where a collective-bargaining agreement provides a method by which disputes are to be resolved, there is a strong policy in favor of deference to that method of resolution. *Hines v Anchor Motor Freight, Inc,* 424 US 554; 96 S Ct 1048; 47 L Ed 2d 231 (1976). This policy can only be effectuated 'if the means chosen by the parties for settlement of their differences under a collective bargaining agreement is given full play.' *United Steelworkers of America v American Mfg Co,* 363 US 564, 566; 80 S Ct 1343; 4 L Ed 2d 1403 (1960). Indeed, the United States Supreme Court has held that the decisions of joint management-labor grievance committees, such as was employed in this case, are entitled to the same deference as the decisions of independent arbitrators. *General Drivers, Warehousemen & Helpers, Local Union No 89 v Riss & Co, Inc,* 372 US 517; 83 S Ct 789; 9 L Ed 2d 918 (1963).
>
> "Although the Supreme Court recognized an exception to the rule of finality in the context of a Title VII employment discrimination claim in *Alexander v Gardner-Denver Co,* 415 US 36; 94 S Ct 1011; 39 L Ed 2d 147 (1974), it has no application to this case. Here, the finding of the grievance committees that plaintiffs seek to avoid is not one of constitutional magnitude or statutory construction; rather, it is a simple question of fact clearly within the competence of the grievance committees. See, also, *Ivery v United States,* 686 F2d 410 (CA 6, 1982), especially Jones, J., *concurring."*
> [Quoting 130 Mich App 377-378.]

In *Fulghum,* we concluded that the "final and binding" decision of the joint management-labor

grievance committees was entitled to judicial enforcement on the issue of whether the grievants were discharged for cause. We held, additionally, that the final decision of the grievance committee precluded the employees' common-law actions for defamation and intentional infliction of emotional distress, pursuant to the doctrine of collateral estoppel.

"It is well-settled that arbitration is a favored means of resolving labor disputes and that courts refrain from reviewing the merits of an arbitration award when considering its enforcement." *Port Huron Area School Dist v PHEA,* 426 Mich 143, 150; 393 NW2d 811 (1986). The legal basis for this policy of judicial deference is "grounded in contract: the contractual agreement to arbitrate and to accept the arbitral decision as 'final and binding.'" *Id.,* 150. In the present case, plaintiff has not alleged corruption, partiality, or any other impropriety on the part of the employee arbitration panel.[2] Whether a broad assertion of procedural "unfairness" is a recognized ground for vacating an arbitral decision, as opposed to assertions that the decision was procured by corruption, fraud, or other undue means, or that there was evident partiality, corruption, or misconduct, on the part of the arbitration panel, is questionable. Unlike the limited exception to the "finality rule" in *Breish,* the final step in the contractual grievance procedure in the present case was not inadequate to provide a "fair" decision on the merits of plaintiff's grievance.

In *Port Huron Area School Dist, supra,* 161, we

---

[2] Additionally, I would note that it has not been argued that the contractual procedure violated public policy because it required plaintiff to forego her judicial remedies or that the contract was entered into under duress. 14 Williston, Contracts (3d ed), § 1725, pp 910-916. *Lafayette Dramatic Productions, Inc v Ferentz,* 305 Mich 193; 9 NW2d 57 (1943).

noted that "[a] party who voluntarily agrees to submit a specific grievance to arbitration may be precluded from later challenging the 'arbitrability' of that grievance."[3] In the present case, plaintiff voluntarily agreed to submit her grievance to the final and binding decision of the employee grievance board after having been fully informed of the procedure. The issue submitted concerned whether she was properly discharged consistent with her contract of employment with the defendant. By mutual consent, the employee grievance board had jurisdiction to determine that issue which involved the factual determination of whether plaintiff was discharged for "deliberate restriction of work."

The finding of the grievance board which plaintiff sought to avoid did not involve any established exception to the rule of finality.[4] I would hold that her agreement to participate in the contractual grievance procedure, and her participation through the final decision of the board, without objecting to any of the procedures of which she was fully informed, precluded plaintiff from challenging the "fairness" of the proceeding after receiving an unfavorable decision. I would emphasize that plaintiff originally consented to the grievance procedure and has not alleged that the procedure deviated to any extent from that to which she had consented.

The majority's analysis undermines this state's policy of encouraging the private resolution of labor disputes. Employers would not be inclined to

[3] See *American Motorists Ins Co v Llanes,* 396 Mich 113; 240 NW2d 203 (1976). See also Anno: *Participation in arbitration proceedings as waiver of objections to arbitrability,* 33 ALR3d 1242.

[4] Plaintiff's wrongful-discharge action involved the same issues which were decided by the employee grievance board; it did not involve any independent statutory claim, and, because the defendant expressly reserved the right to discharge plaintiff for "deliberate restriction of work," no contrary "just cause" requirement could be implied.

agree to arbitration if the resulting awards are binding on them, but not on their employees. In the present case, plaintiff was not contractually compelled to submit her grievance to final and binding arbitration; she voluntarily contracted to do so. The majority's discussion of "elementary fairness" within the context of "claim and issue preclusion" is unrelated to the issue in this case of whether plaintiff was contractually bound by the arbitral decision to which she and the defendant mutually agreed to be bound.

I would conclude that the circuit court erred in not enforcing the grievance board decision as a matter of law. The parties contractually agreed to be bound by that decision and plaintiff was precluded from later challenging the grievance procedure to which she contractually agreed as "unfair." Thus, I would reverse the decision of the Court of Appeals and remand this action for dismissal. My disposition of this issue would make it unnecessary to address the remaining issues.

BRICKLEY and BOYLE, JJ., concurred with RILEY, J.